IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GERALD SMITH, *et al.*,

        Plaintiffs,

   vs.                             Civil Action 2:08-CV-15
                                     Magistrate Judge King

OHIO DEPARTMENT OF REHABILITATION
AND CORRECTION, *et al.*,

        Defendants.

## OPINION AND ORDER

This is a class action brought on behalf of inmates at the Chillicothe Correctional Institution ("CCI") in connection with alleged exposure to unabated asbestos throughout CCI. With the consent of the parties, *see* 28 U.S.C. § 636(c), and following preliminary approval of the parties' stipulated private settlement agreement and certification of a settlement class, the Court conducted an initial fairness hearing on March 13, 2012 and a reopened hearing on April 2, 2012. This matter is now before the Court for final consideration of the parties' private settlement agreement and certification of the class.

## I.   BACKGROUND

On January 4, 2008 and with the assistance of counsel, plaintiffs filed a putative class action for declaratory, injunctive and monetary relief under 42 U.S.C. § 1983, alleging that defendant prison officials have been deliberately indifferent to the welfare of CCI inmates by reason of the presence of asbestos in the institution. *Complaint*, Doc. No. 2. Plaintiffs also asserted a claim of

intentional infliction of emotional distress. *Id*. On November 11, 2008, the *First Amended Complaint*, Doc. No. 18, was filed which deleted the earlier request for compensatory damages.[1]

The Court established an initial case schedule, which was later extended, and the parties engaged in extensive discovery, including expert discovery. *See*, *e.g.*, *Continued Preliminary Pretrial Order*, Doc. No. 22; *Order*, Doc. No. 37; *Order*, Doc. No. 42. On April 15, 2009, plaintiffs filed a motion to certify the class. Doc. No. 23. After that motion was fully briefed, Doc. Nos. 29 and 35, the Court stayed resolution of the motion pending settlement discussions between the parties. *Order*, Doc. No. 61; *Order*, Doc. No. 64. The Court also suspended the pretrial schedule to allow the partie to fully explore the possibility of settlement. *Order*, Doc. No. 60. For months, the parties worked toward resolution of the issues in the case and attempted to formulate a plan for asbestos remediation, which included the appointment of a prison work committee tasked with supplementing an earlier report addressing asbestos in CCI. *Id.*; *Order*, Doc. No. 64; *Order*, Doc. No. 69.

On March 15, 2010, after nearly a year of settlement discussions, the parties filed a joint motion to certify a class for settlement purposes. Doc. No. 73. That motion also sought leave to withdraw the earlier motion to certify and requested that the statute of limitations for all claims of the putative class members in the *First Amended Complaint* be tolled pending resolution of the joint motion to certify the settlement class. *Id*. The Honorable John D. Holschuh, to

---

[1] The *First Amended Complaint* included a request for nominal and punitive damages.

whom the case was assigned at the time, granted that motion. *Order*, Doc. No. 76.

From early 2010 into August 2010, efforts to conduct a comprehensive inspection of CCI for the presence of asbestos went forward and the parties continued to formulate proposed terms of a joint remediation plan and other terms of settlement. *Order*, Doc. No. 79; *Order*, Doc. No. 102; *Order*, Doc. No. 123. An asbestos consulting firm that had previously inspected CCI for the presence of asbestos was retained. Months were devoted to the completion of that inspection and the preparation of a report, both of which were necessary in order to formulate a remediation plan and finalize terms of proposed settlement. *See Order*, Doc. No. 123; *Order*, Doc. No. 129; *Order*, Doc. No. 132; *Order*, Doc. No. 134. After the asbestos consulting firm's inspection and report were completed in early 2011, the parties participated in a joint discussion with that firm in order to address questions and concerns raised by that inspection and report. *See Order*, Doc. No. 134. Although the parties made significant progress on a proposed resolution of the action, additional issues related to asbestos remediation remained unresolved. *Order*, Doc. No. 135.

On March 31, 2011, the parties filed a joint motion to withdraw the earlier motion to certify a settlement class and asked the Court to continue to toll the statute of limitations period for all putative class members. Doc. No. 137. In so moving, the parties explained that any eventual settlement agreement must necessarily include a complex plan for addressing asbestos at CCI and would, in turn, define the class. *Id*. at 2. The Court granted the parties' request to

3

withdraw the motion to certify and continued to toll the statute of limitations for all putative class members. *Order*, Doc. No. 138.

From May 2011 through November 2011, the parties continued to negotiate precise terms of a settlement agreement and class definition, utilizing information provided by the asbestos consulting firm. *Order*, Doc. No. 141; *Order*, Doc. No. 142; *Order*, Doc. No. 143; *Order*, Doc. No. 149; *Order*, Doc. No. 156; *Order*, Doc. No. 167.

On November 28, 2011, the parties agreed to final terms of settlement and sought the Court's approval of that agreement. *Joint Motion for Preliminary Approval of Proposed Class Action Settlement*, Doc. No. 170 ("*Joint Motion for Preliminary Approval*"); *Private Settlement Agreement*, attached thereto as Exhibit 1 ("*Private Settlement Agreement*"). The Court preliminarily approved the parties' stipulated settlement, certified a settlement class, directed that notice be given to the class and scheduled a fairness hearing. *Order Preliminarily Approving Private Settlement Agreement, Authorizing Class Notice, and Setting Fairness Hearing*, Doc. No. 172 ("*Order of Preliminary Approval*"). Notice was provided to the members of the class in compliance with the direction of the Court and Rule 23(e). *Order of Preliminary Approval*, ¶¶ 5-6; *Notice*, attached thereto. Objections to the proposed settlement were to have been filed by January 9, 2012. *Order of Preliminary Approval*, p. 1.

The initial fairness hearing, conducted pursuant to Fed. R. Civ. P. 23(e), proceeded on March 13, 2012 ("the initial hearing"). Although no members of the class appeared, objections to the proposed settlement were filed with the Court. *See* Doc. Nos. 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 188, 193, 194. At the initial

4

hearing, counsel for the parties addressed the *Private Settlement Agreement*, the objections thereto and the factors to be considered under Fed. R. Civ. P. 23(a), (b)(2) and (e). Evidence was submitted, including the sworn testimony of the former trial attorney for defendants, Richard Cholar, Esq., and one of the attorneys for plaintiffs and the plaintiff class, Jeffrey Donnellon, Esq.

Additional motions and an affidavit were filed after the initial hearing was held. Doc. Nos. 192, 193, 194. The motions sought to join two individuals as class representatives and questioned the adequacy of representation by class counsel and the current class representative, Alfonsia Perry. Doc. Nos. 192, 193. The Court reopened the fairness hearing on April 2, 2012 ("the reopened hearing") and issued a writ of habeas corpus *ad prosequendum* to secure the testimony of Mr. Perry. Doc. No. 197. Following the reopened hearing, defendants expressed their continued agreement with the joint motion to certify a settlement class and request that the Court approve the *Private Settlement Agreement*. *Defendants' Unopposed Clarification of Facts*, Doc. No. 199.[2]

The issues of class certification and whether the *Private Settlement Agreement* is fair, adequate and reasonable will be addressed in turn.

## II. FINAL CERTIFICATION OF THE SETTLEMENT CLASS

The parties ask that the Court certify a class consisting of all

---

[2]More specifically, defendants' clarification addresses Mr. Perry's testimony at the reopened hearing relating to privileged housing and protective control. *Id.*

inmates in areas identified as containing unabated asbestos at CCI ("the Class"). *Private Settlement Agreement*, ¶ 3. Rule 23 of the Federal Rules of Civil Procedure governs class actions. "To obtain class certification, a claimant must satisfy two sets of requirements: (1) each of the four prerequisites under Rule 23(a), and (2) the prerequisites of one of the three types of class actions provided for by Rule 23(b). A failure on either front dooms the class." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945-46 (6th Cir. 2011).

### A. Factors Under Fed. R. Civ. P. 23(a)

Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). *See also Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002) ("In order to obtain class certification, plaintiff must first satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation."). The trial court may certify a class only if, "after a rigorous analysis," these prerequisites have been satisfied. *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982) (internal quotation marks omitted)). Although a trial court has broad discretion in the certification process, the court must nevertheless exercise that discretion within the framework of Rule 23. *In re American Medical*

6

*Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

        **1.    Numerosity**

        Rule 23(a) first requires that "the class [be] so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). This determination does not establish a strict numerical test and a showing of a "substantial" number of class members usually satisfies the requirement. *In re American Medical Sys.*, 75 F.3d at 1079; *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). *See also Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 570 (6th Cir. 2004) ("However, sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1).").

        Here, the parties contend that the numerosity element is met. Former lead defense counsel Richard Cholar testified at the initial hearing that there are approximately 2600 inmates currently housed at CCI. Of course, this number does not include future CCI inmates who may also be exposed to asbestos. The Court finds that this class size is sufficiently numerous that joinder of all members is impracticable. *See*, *e.g.*, *Bacon*, 370 F.3d at 570; *Wess v. Storey*, No. 2:08-cv-623, 2011 U.S. Dist. LEXIS 41050, at *17 (S.D. Ohio April 14, 2011) (finding that a putative class of 220 members satisfied Rule 23(a)(1)'s numerosity requirement); *Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321, 325-26 (S.D. Ohio 2009) (concluding that a class of 375 members with a subclass of at least 90 members satisfied this element).

        **2.    Commonality**

The second requirement under Rule 23(a) is that the class share at least one common question of law or fact "the resolution of which will advance the litigation."  Fed. R. Civ. P. 23(a)(2); *Alkire*, 330 F.3d at 820.  Merely because questions unique to individual class members may remain does not necessarily preclude a finding that the commonality requirement has been satisfied.  *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 608 (S.D. Ohio 2003).

The parties contend that the putative class shares common questions of law and fact.  This Court agrees.  For example, determining whether CCI has deliberately exposed the class to dangerously high levels of unabated, exposed and/or friable asbestos, *see*, *First Amended Complaint*, ¶ 72(B), is a material question common to all members of the Class.  Other common questions include:

1.   Whether CCI has knowingly created unreasonable risks of serious damage to the present and future health of the Class in violation of the Eighth and Fourteenth Amendments to the United States;

2.   Whether CCI has knowingly required inmates to abate exposed and/or friable asbestos without proper training, containment or personal protective clothing, masks and/or equipment, thereby exposing the inmates to dangerously high levels of asbestos;

3.   Whether CCI failed to implement policies or procedures that would have prevented these unreasonable risks of serious damage to inmates' future health and/or failed to follow existing policies or procedures to prevent such well known risks of harm;

4.   Whether injunctive and/or declaratory relief will remedy or alleviate CCI's alleged ongoing class wide constitutional violations.

8

*First Amended Complaint*, ¶ 72(B).  The Court concludes that all these questions, which are common to all members of the Class, require an intensive factual inquiry and in-depth legal analysis that will be most efficiently resolved in the context of a class action.

### 3.    Typicality

Rule 23(a) also requires that the claims of the class representative be typical of the claims and defenses of the class. Fed. R. Civ. P. 23(a)(3).  A "typical" claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and [must be]based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *American Med. Sys.*, 75 F.3d at 1082) (internal quotation marks omitted).  However, "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Id*. (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976) (internal quotation marks omitted)). "Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Sprague v. GMC*, 133 F.3d 388, 399 (1998).

Here, the class representative, Alfonsia Perry, is currently incarcerated at CCI. *Unopposed Motion to Substitute Class Representative*, Doc. No. 147; *Order*, Doc. No. 148; *Transcript of Reopened Fairness Hearing* ("*Transcript*"), p. 8.  Mr. Perry has lived at CCI for more than ten years and expects to remain there. *Transcript*, pp. 8, 10, 36.  As a long-term CCI inmate, Mr. Perry's

9

interests arise from the same events, practice or course of conduct
that give rise to the claims of the Class, namely, the alleged
presence of asbestos in the prison facility.  Mr. Perry, who testified
at the reopened hearing, shares with the Class an interest in ensuring
that asbestos is properly contained or removed from CCI:

Q:    Why did you get involved in this case?

A:    Again, friends was dying.  It's personal to me,
      because I'm doing an extended sentence to where I'm
      stuck at Chillicothe.  And if I'm to live there, I
      want it cleaned up.

Q:    Do you have an understanding that, as class
      representative, you bring the case for everyone else
      that had the same thing happen to them?

A:    Yes, sir.

*              *              *              *

Q:    What do you believe that this lawsuit is
      accomplishing, aside from putting money in inmates'
      pockets?

A:    It's really about cleaning up Chillicothe from its
      hazardous containment there.  Chillicothe is filthy.

Q:    You want asbestos at Chillicothe cleaned up?

A:    Yes, I do.

Q:    You don't want inmates exposed to that?

A:    No, --

Q:    Do you-- go ahead.

A:    -- because, early on, I said-- like I was trying to
      explain, so many of my friends have died down there
      behind these, the diseases.  And the truth is not
      getting out there as to why they're dying.  And I
      believe there's a health risk.

Q:    You believe they're exposed to a lot of contaminants,
      and asbestos is one of them?

A:    Yes, sir.

> Q:     Do you explain to other inmates what the private
>        settlement agreement does?
>
> A:     Yes.

*Transcript*, pp. 10, 17.  The Court is satisfied that the typicality
prerequisite is met.

### 4.   Adequacy

The final prerequisite under Rule 23(a) guarantees that the class
representative "will fairly and adequately protect the interests of
the class." Fed. R. Civ. P. 23(a)(4).  This inquiry is two-pronged:
"1) the representative must have common interests with unnamed members
of the class, and 2) it must appear that the representatives will
vigorously prosecute the interests of the class through qualified
counsel." *In re American Medical Sys.*, 75 F.3d at 1083 (quoting
*Senter*, 532 F.2d at 525 (internal quotation marks omitted)).  The
Court concludes that both prongs have been met.

### a.   Adequacy of Mr. Perry as class representative

First, no conflicts of interest exist between Mr. Perry and the
putative class.   As discussed *supra*, Mr. Perry shares with the Class
the common interest in safely comtaining and removing asbestos from
CCI.

Second, Mr. Perry has demonstrated that he has pursued and will
continue to vigorously pursue the interests of the Class throughout
this litigation.  As an initial matter, Mr. Perry has been involved in
this matter since 2007, predating the filing of this action, and he
was one of the named plaintiffs in the original *Complaint*.
*Transcript*, pp. 9-10.  Before being named a class representative, Mr.
Perry communicated with plaintiffs' counsel about this action:

> Q:    I want to talk for a minute about your duties as class
>       representative.  Prior to becoming class
>       representative, did you have communication with my
>       office?
>
> A:    Yes, sir.
>
> Q:    Explain that to the Court.
>
> A:    Well, I've written you several letters trying to show
>       my support in this lawsuit.  I've spent my own monies
>       trying to do the best I can for everybody concerned in
>       this matter.
>
> Q:    Were you one of the named plaintiffs on the original
>       complaint that was filed in this case?
>
> A:    Yes, sir.
>
> Q:    And did you mail to my office information about
>       asbestos at the prison?
>
> A:    Yes, sir.
>
> Q:    Prior to becoming class representative, the letters
>       you sent to my office, did you receive any responses
>       from my office?
>
> A:    Yes, sir.
>
> Q:    Did you receive information about the lawsuit?
>
> A:    Yes, sir.

*Id*. at 10-11.

Mr. Perry became the class representative in this case on August 8, 2011.  *Order*, Doc. No. 149.[3]  During the reopened hearing, Mr. Perry explained that other inmates had asked him to become the class representative and inmates contacted plaintiffs' counsel to nominate Mr. Perry.  *Transcript*, p. 11.

As class representative, Mr. Perry continued to raise questions

---

[3]Mr. Perry replaced Jack Frederick, who was transferred out of CCI, as class representative.  *Id.*; Doc. No. 147.  During the initial hearing, class counsel advised the Court that the first named class representative, Gerald Smith, was released from prison and later died.

regarding the litigation, to communicate with class counsel and to
receive information from counsel, including Court filings and letters.
*Id.* at 11-12.  When he receives information from counsel, Mr. Perry
spends his own money to make copies of documents and shares
information with the Class:

> Q:   I want you to explain to the Court what you do when
>      you receive something from my office?
>
> A:   Okay.  When I receive something from your office, I
>      take them, and I go copy them.  I make about ten to
>      fifteen copies, and I share them copies with guys from
>      every dorm.  So, I make sure that every dorm would
>      have that information, and I make sure that I spend my
>      own monies to do so, because some guys can't afford
>      copies.  So, I make sure I have extra copies for them.
>
> Q:   Does someone have to ask you to do that?
>
> A:   No.
>
> Q:   Do you do that every time I send you something?
>
> A:   Yes.
>
> Q:   And you make sure that someone in each dorm gets a
>      copy?
>
> A:   Yes.
>
> Q:   And explain to the Court what happens with those
>      copies after you distribute them.
>
> A:   Many guys take them, and they will make copies of them
>      copies, and we would more or less just circulate them
>      throughout the prison.  And if there is any questions
>      then that they would come to me or we would have group
>      meetings, and I would discuss the documents with them.
>
> Q:   Do inmates ever come to you and ask you for documents
>      from the case?
>
> A:   Yes.
>
> Q:   Explain to the Court what you do when that happens.
>
> A:   I have extra copies.  I make extra copies, and I make
>      sure that they understand what that document was and
>      what – what we were looking forward to that's next as

13

far as a hearing or whatever.

 Q: Have you ever refused anyone copies if they asked you?

 A: No.

*Id*. at 12-14.

 Q: I believe you testified that there were 12 dorms at CCI; is that correct?

 A: I think – I'm just thinking 12 dorms.  It's more buildings, but I was just talking about the dormitories.

 Q: Am I correct in the understanding that you had helpers at each of those dorms to help disseminate information?

 A: Yes, ma'am.  What I done was, I chose a guy from each dorm that, whenever information come in, we would all meet together at the yard, since we don't have no place to meet at.  So, we'd meet at the yard, at the tables, and I'd make copies, and I'd give a copy of it, and then we would – I would sit down, and we would discuss that information so everybody can go back to their dorms and explain what the motion is, who wants copies or whatever.

*Id*. at 49-50.

In addition to providing copies of documents, Mr. Perry routinely answers questions from other inmates about this litigation:

 Q: . . . Are you frequently confronted by other inmates with questions about this case?

 A: All the time.

 Q: Tell the Court about that.

 A: Well, I'm always stopped and asked about what's going on, where the case is, how is it headed.  And I try to explain, the best that I can, about what's going on.

 Q: Are you up front with other inmates about the case?

 A: All the time.

*Id*. at 15.  *See also id*. at 36.

Mr. Perry testified that one of the documents he received,

14

distributed and discussed was the *Private Settlement Agreement*. *Id.*
at 19-20. Mr. Perry met with class counsel to go over all of the
provisions of the *Private Settlement Agreement* so that he could
understand and explain the agreement to other inmates:

> Q:  Let's talk about the private settlement agreement.
>     Did you receive a copy of it?
>
> A:  Yes, sir.
>
> Q:  I mailed you a copy?
>
> A:  Yes, sir.
>
> Q:  Did I come to CCI to meet with you to go over it?
>
> A:  Every page.
>
> Q:  Explain that to the Court.  What did we do?
>
> A:  Well, we came – you came to the prison, and we went
>     page by page, because you wanted to make sure that I
>     understood so I could explain things to the inmates on
>     the grounds.  I've made copies of it.
>
> Q:  When I was there and we went over the private
>     settlement agreement, how long was I there?
>
> A:  Two plus hours.
>
> Q:  Were there any questions that you had that I didn't
>     answer?
>
> A:  No.
>
> Q:  Do you want the Court to approve the private
>     settlement agreement?
>
> A:  Yes.
>
> Q:  And I think I've asked you this already, but what do
>     you believe the private settlement agreement will
>     accomplish?
>
> A:  I'm praying that it will clean up Chillicothe.  That's
>     my biggest issue.
>
> Q:  Clean up asbestos at Chillicothe?
>
> A:  Asbestos, yeah.  It's terrible there.

15

*Id.*

Prior to the initial hearing, Mr. Perry filed an objection to the *Private Settlement Agreement*, expressing concern that the terms were unfair for several different reasons. Doc. No. 185. However, after he filed that document, class counsel met again with Mr. Perry to ask him about those concerns. Mr. Donnellon testified that he met with Mr. Perry for more than an hour and learned that Mr. Perry did not intend, by filing that objection, to derail the settlement process. Rather, according to Mr. Donnellon, Mr. Perry now understands that certain provisions in the *Private Settlement Agreement* permit him and the other inmates to file a claim in state court to enforce the terms of the *Private Settlement Agreement*. Acting on behalf of Mr. Perry, Mr. Donnellon thereafter filed a notice to withdraw Mr. Perry's objection. Doc. No. 186.[4]

Mr. Perry's testimony at the reopened hearing supports counsel's testimony in this regard and supports Mr. Perry's repudiation of his objection. Specifically, Mr. Perry testified that he believes that the *Private Settlement Agreement* is fair and adequate and that it provides an appropriate remedy should prison officials not comply with their obligations under the agreement:

> THE COURT:       Now, you testified that you believe that the private settlement agreement is fair and adequate and reasonable.
>
> ALFONSIA PERRY: Yes, ma'am.
>
> THE COURT:       And do you want the Court to approve that?

---

[4]The Court took that issue under advisement at the initial hearing. *See* Fed. R. Civ. P. 23(e)(5)(". . . the objection may be withdrawn only with the court's approval").

16

>
> THE WITNESS:      Yes, ma'am.  And the reason is because,
>                   again, CCI needs cleaned up, but it gives
>                   us some type of backing in case CCI do not
>                   clean it up, that we've got other avenues
>                   to come back into the court to either sue
>                   them personally, individually, or to raise
>                   them issues back with this Court that
>                   they're not doing what they said they was
>                   going to do, because I don't believe
>                   they'll do it.

*Id.* at 49.  *See also id.* at 20, 47 (confirming that Mr. Perry wants the Court to approve the *Private Settlement Agreement*, which he believes is fair, adequate and reasonable).

When Mr. Perry explains the details of the *Private Settlement Agreement* to other inmates, some inmates are upset to learn that the *Private Settlement Agreement* does not include the payment of monetary damages to members of the Class.  *Id.* at 15-18.  In addressing concerns about the *Private Settlement Agreement*, Mr. Perry explains to these inmates that they are free to file their own lawsuit for money damages:

> Q:  What about inmates that are upset they won't be
>     getting money damages in this lawsuit?
>
> A:  They --
>
> Q:  Do you ever tell them anything?
>
> A:  Well, I've tried to address that.  But if somebody
>     don't want to hear something, they just don't want to
>     hear.  I give them the basics on what to do and how to
>     do it, and, if they're not satisfied, they could file
>     their own lawsuit.
>
> Q:  Have you ever explained that to other inmates: that
>     the private settlement agreement gives them the right
>     to file their own lawsuit, tolls the statute of
>     limitations?
>
> A:  Yes.

*Id.* at 19-20.

17

In addressing the specific concern that prison officials will not comply with their obligations under the *Private Settlement Agreement*, Mr. Perry now explains to the inmates that the Class has recourse under those circumstances:

Q:   Are some inmates concerned that CCI won't follow through on the agreement?

A:   Yes, and I'm one of them.

Q:   Are some inmates concerned that, all the areas that it's been agreed that asbestos will be removed, that maybe that won't happen?

A:   Yes.

Q:   Do you have that conversation with other inmates?

A:   All the time.

Q:   What do you tell them about that? What does the private settlement agreement do to address that?

A:   The private settlement agreement is to address the fact that, if CCI do not keep up with their part of the bargain, that they could file individual lawsuits.

Q:   Who could?

A:   Anybody that's at CCI, any inmate.

Q:   Any inmate?

A:   Any inmate.

Q:   Do you explain that to other inmates?

A:   Yes.

Q:   Is that a frequent conversation you have?

A:   Yes. That's the biggest conversation I have.

*Id*. at 18-19.

Mr. Perry's experience as the representative of the Class has not been easy:

Q:   Because of this lawsuit, do you deal with inmates you

18

        normally wouldn't deal with?

A:    All the time.

Q:    Does that create problems for you?

A:    Yes, and – yes.

Q:    Tell the Court about that.

A:    I explain this case probably, give or take, 30, 40, times a day to different guys, some people who dislike me, some people who are prejudiced, but they send other guys to me to see where this case is going.  And I explain to them what's what.  And there's always attitude because they think that I'm not coming forward enough about what's going on.

*Id.* at 17-18.

On March 14, 2012, after the initial hearing and more than two months after the date by which objections to the *Private Settlement Agreement* were due, two documents, signed by Mr. Perry, were filed with the Court.  These documents call into question the adequacy of Mr. Perry as a class representative, of class counsel's representation and the of *Private Settlement Agreement*. *See* Doc. Nos. 192, 193. More specifically, Mr. Perry signed both pages of a two-page document entitled *Motion to Intervene By Inclusion of Multiple Class Representatives Pursuant to Rule 23(d)(1), (B)(C) & (2) Federal Rules Of Civil Procedure*, Doc. No. 192 ("*Motion for Multiple Class Representatives*").[5] Two other CCI inmates, Michael Roberts and Jerome Royster, also signed this document which asks that Mr. Roberts and Mr. Royster be added as class representatives. *Id.* 1-2.  As an initial matter, the *Motion for Multiple Class Representatives* does not address the untimeliness of the motion, nor does the motion complain either

---

[5]Doc. No. 193, relating to the adequacy of class counsel, will be addressed *infra*.

that the notice to the Class was inadequate or that the movants lacked
sufficient time in which to file objections.   The Court therefore has
no obligation to consider this untimely motion.  *Cf. UAW v. Gen'l
Motors Corp*, 497 F.3d 615, 636 (6th Cir. 2007) (noting that the
district court has "traditionally broad discretion over the evidence
it considers when reviewing a proposed class action settlement").

However, even considering the merits of the *Motion for Multiple
Class Representatives*, that motion does not persuade this Court that
additional class representatives are needed and/or that Mr. Perry is
an inadequate class representative.  The "Memorandum in Support"
appearing on page two of the *Motion for Multiple Class Representatives*
advances three reasons to add Mr. Royster and Mr. Roberts as class
representatives: (1) Mr. Perry's "transitory conditions" (presumably
referring to the possibility that Mr. Perry, like any inmate, might be
transferred to another prison); (2) Mr. Perry's "oratory impediment"
and (3) having only one class representative for "approximately" 3,000
CCI inmates is unfair and/or prejudicial.  *Id.* at 2.  Significantly,
however, Mr. Perry testified that the "Memorandum In Support" was not
printed on the second page at the time that he signed the *Motion for
Multiple Class Representatives* and that he would not have signed the
document had he seen this text:

> Q:   And you see on the second page, where I'm pointing
>      here, at the top, it says: PAGEID #: 822?
>
> A:   Yes.
>
> Q:   Okay.  I'm going to ask you a few questions about this
>      document, Mr. Perry.  I want to start by asking you a
>      couple of questions about the second page, —-
>
> A:   Okay.

Q:    —- the page with the "Memorandum in Support" at the
      top.

A:    Okay.

Q:    When you signed the second page, I want you to explain
      to the Court what was on this document.

A:    Okay.  When we did this second motion, here, the only
      thing that was on this page was the "Wherefore" and
      the end.  There was no memorandum in support ever
      there.

Q:    And I just want to clarify – I think we understand
      what you're saying, but just to make sure, you're
      saying, the first half of this page, where it says
      "Memorandum in Support" and all the text beneath that,
      up until where we get to where it says "Wherefore" was
      not on this document when you signed it?

A:    No, it wasn't.  May I explain something?

Q:    Sure.

A:    When we do motions as pro se, this is how we – we
      would do the front.  Excuse me.  And we would end it
      at the bottom with the "Wherefore" and close off.  So,
      the "Wherefore" would be – the "Wherefore" would be on
      the bottom, and that would conclude that motion.  But
      there wasn't nothing written prior to that.

Q:    When is the first time you read the memorandum in
      support part of that document?

A:    The date you brought it down to the jail.

Q:    Had you see that —-

      THE COURT: Can I interrupt?  To the jail or CCI?

      THE WITNESS: I mean CCI.

      THE COURT: Okay.

BY MR. DONNELLON:

Q:    Had you seen that prior to it being filed?

A:    No, sir.  I want to make sure that the Court
      understands that, had I have seen these prior to it,
      they never would have got filed the way they did.
      These were filed, and I – I don't even have a copy of
      them.

21

*Id.* at 27-28.

Mr. Perry testified that he was upset when he learned that the "Memorandum in Support" had been added and filed without his consent, pointing out that the additional text even misspelled Mr. Perry's name:

> Q: How did you feel when you learned that information with that document, without your knowledge, had been filed?
>
> A: I was upset with that, too. And I wanted to clarify, too, that this document here (indicating), even the spelling of my name should let the Court know that I didn't see it, because he's got my name spelled A-L-F-O-N-Z-O.

*Id.* at 28. *See also id.* at 53-54 (class counsel Mr. Donnellon testifying regarding Mr. Perry's reaction when meeting with Mr. Perry to review Doc. Nos. 192 and 193 for the first time).

Mr. Perry went on to explain that, at the time he signed the *Motion for Multiple Class Representatives*, he believed that adding Mr. Roberts and Mr. Royster as "co-reps" simply meant that these inmates would help Mr. Perry, who previously resided in the E-2 dorm, distribute information to Class members residing in CCI's D dorm:

> Q: When you signed this paperwork [Doc. Nos. 192 and 193], did you believe that this was for two separate motions, or for one motion?
>
> A: One motion. What I thought, we believed, was that these were only to be co-reps for me at the prison. That's all.
>
> *       *       *       *
>
> Q: You were approached by some inmates in the D dorm--
>
> A: Yes.
>
> Q: -- prior to signing these documents?
>
> A: Yes.

Q:    And they wanted to be added to this case as co-reps?

A:    Yes.

Q:    Explain to the Court your understanding of that.  What would a co-rep be?

A:    Okay.  A co-rep would be someone, if I couldn't make it out, as far as – as my understanding, that they would be able to either go in my place or, if I was busy or caught up in a class or something, that they could go out and meet with the attorneys, and we would all share that information again.

   *                *                *                *

Q:    So, you were approached by some inmates.  They asked you to sign your name on a document, correct?

A:    Yes.  Yeah.  After we had discussed the co-rep part, just being co-reps; and just, more so, they were supposed to help me in areas to where I couldn't go, like D dorm two and three.  You've got to have permission to go to different dorms or whatever.  And that's how we was going to spread information.

Q:    But at the time you signed that, your understanding is that you would still be the main class representative?

A:    Yes.

*Id*. at 29-30.  *See also id*. at 31-32.

Q:    When you were approached by Mr. Roberts and Mr. Royster, when those documents [Doc. Nos. 192 and 193] were signed, you're listed as class representative, correct?

A:    Yes, sir.

Q:    And they're listed as co-class representatives, correct?

A:    Yes.

Q:    Was your understanding that they would simply serve the D dorm?

A:    Yes.

Q:    Explain that to the Court.

A:    D dorm's got five dorms in there.  And there is steps

23

> in each dorm that every inmate – you can't go from one
> up to two without permission to go.  Everybody got –
> you've got to ask permission to go.  So, with me
> giving information out, everybody would have documents
> to tell everybody in their dorms.  Now there is about
> 12 different dorms in our institution.  And, some
> dorms, I can go in, you know, depending on the
> officer, to share information with.  Some, I can't.

*Id*. at 33-34.  Mr. Perry explained that he agreed to sign the motion

in order to ease the burden of distributing information to the members

of the Class at CCI.  *Id*. at 31, 34-35.  Mr. Perry emphasized that his

initial approval of Mr. Roberts and Mr. Royster serving as co-

representatives changed after Mr. Perry saw the "Memorandum in

Support."  *Id*. at 32-33.

 Notwithstanding the pressures of serving as class representative,

Mr. Perry confirmed that he wants to continue to serve in that

capacity, explaining that "a lot of" inmates trust him.  *Id*. at 30,

36-37.  Mr. Perry went on to explain that he enjoys a good

relationship with other inmates and that a new class representative

would face more pressures and difficulties than those that Mr. Perry

currently experiences:

> Q: If the Court were to not approve you as class
> representative and we had to find a new class
> representative, what kind of pressures would that
> inmate face?
>
> A: Probably more worse than mine, because I've got a good
> – I've got a good rapport with a majority of guys,
> because they know me and they know how I am.  They
> know – they know that I'm about business and I try to
> treat everybody right.
>
> Q: Would an inmate who has been at CCI for a short period
> of time make a good class representative?
>
> A: That's a hard question to ask, but I would say no.
>
> Q: Do you think a new class representative would face
> more pressures than you do?

24

A:    Probably.

Q:    Explain that to the Court.

A:    I've been used to the process of CCI and how inmates
      think down there, and I don't let too much sway me
      from doing what I have to do as a representative.  And
      I can't really speak on someone else, but I don't
      think that they would be able to deal with the
      pressure or to share the information that is given the
      way I do.

Q:    Is it possible that a new class representative could
      face violence from other prisoners?

A:    Sure.

*Id.* at 37-38.  Finally, Mr. Perry testified that his actions and

opinions are not influenced by promises or threats:

    THE COURT:

Q:    Do you feel at all pressured or coerced in your
      testimony here today?  Did anyone threaten you or
      promise you anything to testify about anything you've
      testified to here today?

A:    No, ma'am.

Q:    Has anybody made you any promises that you'll get some
      benefit if you testify in a certain way here today?

A:    No, sir.

Q:    Has anyone threatened you that you would suffer harm
      or punishment if you testified differently than you've
      testified here today?

A:    No, ma'am.  I'm doing this, again, and I'm telling the
      truth in this case because so many of my friends,
      since I've been incarcerated, have died from diseases
      at that institution.  And I'm going to stand up for
      them and for the guys who is sick now.  I'm sick now,
      I believe, but we can't get the adequate medical
      attention that we're supposed to have.  Okay?  And I
      just wanted to be able to set the record straight as
      far as the importance of me being the dorm rep here
      and that I do whatever counsel tells me to do and what
      this Court tells me to do and, more so, what inmates
      ask of me to do when it comes to me asking questions

                              25

to our counsel about things that's going on.
*Id*. at 47-49.  *See also id*. at 35 (denying that class counsel promised
him anything beyond the settlement terms that apply to all inmates).

Considering all this evidence, the Court concludes that Mr. Perry
is an adequate class representative because he shares common interests
with the Class and will vigorously prosecute the interests of the
Class.  In reaching this conclusion, the Court credits Mr. Perry's
testimony that, at the time he signed the *Motion for Multiple Class
Representatives*, he was unaware of and did not agree to all the
language contained in that document at the time it was filed.
Moreover, none of the three proffered reasons in the *Motion for
Multiple Class Representatives* persuades this Court that additional
class representatives are necessary.  First, addressing the allegation
of Mr. Perry's "transitory conditions," there is nothing in the record
that suggests that Mr. Perry will be transferred from CCI.  In fact,
Mr. Perry testified that he is serving an "extended sentence" at CCI.
*Transcript*, p. 10.  Second, contrary to the suggestion that Mr. Perry
suffers from an "oratory impediment," the Court found Mr. Perry to be
an articulate witness who had no difficulty answering questions and
expressing his thoughts during the reopened hearing.  Third, there is
nothing before the Court to suggest that additional class
representatives are needed simply because there are "approximately"
3000 CCI inmates in the Class.  Mr. Perry explained at length the
procedure followed by him in disseminating information, which includes
providing copies to inmates from other dorms who in turn further
distribute information.  Moreover, other filings by Mr. Roberts and
Mr. Royster suggest that the primary interest of these inmates may be

26

the recovery of money rather than the safe removal of asbestos from CCI.  *See* Doc. No. 95 (Mr. Royster's objection to the withdrawal of the claim for damages);[6] Doc. No. 183 (Mr. Roberts's objection complaining, *inter alia*, that the *Private Settlement Agreement* provides only injunctive relief and not monetary damages).[7] Conversely, Mr. Perry's credible testimony underscores the conclusion that he is genuinely concerned with achieving a safe environment for all inmates at CCI.  In sum, Mr. Perry is an articulate and effective class representative who will vigorously represent the interests of the Class.

### b.  Adequacy of class counsel

In addition, the Court is satisfied that class counsel is qualified and has vigorously represented the interests of the class. More specifically, class counsel has substantial experience with class actions and civil rights litigation.  *See* Plaintiff's Exhibit 1, attached to *Minute Entry*, Doc. No. 191, pp. 5-10.  In addition, one of the class counsel, Mr. Donnellon, testified at the initial hearing regarding his regular contact with class representatives during the course of this litigation.

On March 14, 2012, following the initial hearing, a document entitled *Motion for Signifying Lack of Fair and Adequate Representation Pursuant Rule 23(d)(1)(B)(iii) Federal Rules of Civil*

---

[6]The Court previously overruled this objection, concluding that the class members' "rights to pursue nominal and punitive damages have been adequately preserved by this Court's tolling of the statute of limitations and according to the parties, will continue to be preserved by the proposed settlement agreement."  *Memorandum Opinion and Order*, Doc. No. 125, p. 6.

[7]Mr. Roberts's objection, as well as other inmates' objections, will be addressed *infra*.

*Procedure*, Doc. No. 193 ("*Motion Regarding Adequacy of Class Counsel*"), was filed.[8]  This document, which appears to be signed on page one by Messrs. Perry, Roberts and Royster, questions the adequacy of class counsel.  *Id.* at 1-2.  More specifically, the "Memorandum in Support" appearing on page two of the *Motion Regarding Adequacy of Class Counsel* complains of inadequate representation in four respects: (1) class counsel has failed to include the class representative "in any real meaningful discussion" about the proposed *Private Settlement Agreement*; (2) class counsel's "lack of communication;" (3) class counsel's "lack of fiduciary duty" to class members' claims for monetary damages; and (4) "failure to hold ODRC accountable[.]"  *Id.* at 2.  Only the signature of Mr. Roberts appears on page two below the "Memorandum in Support."  *Id.*

The *Motion Regarding Adequacy of Class Counsel* does not alter this Court's conclusion that class counsel is qualified and will continue to vigorously represent the interests of the Class.[9]  As with the *Motion for Multiple Class Representatives*, Mr. Perry testified that the "Memorandum in Support" was not part of the motion when he signed the document and that he disagrees with the assertion that class counsel is inadequate:

_____

[8]As was the *Motion for Multiple Class Representatives*, the *Motion Regarding Adequacy of Class Counsel* was filed more than two months after the deadline for filing objections had passed.  The *Motion Regarding Adequacy of Class Counsel* does not complain that notice to the Class was untimely or that there was inadequate time to file objections.  Although this motion is therefore untimely and the Court need not consider it, *cf. Gen'l Motors Corp*, 497 F.3d at 636, the Court will nevertheless address the merits of the motion.

[9]The other criticism raised in the *Motion Regarding Adequacy of Class Counsel*, which relates to complaints that the *Private Settlement Agreement* does not contain a claim for monetary damages or a provision to "hold ODRC accountable," will be addressed *infra*.

28

Q:    When is the first time you saw page 2 of that document
      [Doc. No. 193]?

A:    The day you brought it to the court.  I mean to the
      jail.

Q:    The day I brought it --

A:    Yes.

Q:    -- to CCI?

A:    Yes.

Q:    Did you see page 2 of that document prior to it being
      filed?

A:    No.

Q:    Who signed page 2 of that document?

A:    Mr. Roberts.

Q:    Do you agree with anything that's on the second page
      of that document?

A:    No, I don't.

Q:    The second page of that document states that the
      counsel in this case are inadequate and that they've
      breached their fiduciary duties.  Do you agree with
      that?

A:    No.

Q:    What is your opinion of the attorneys that have
      represented the plaintiffs in this case?

A:    Thank you for asking that question.  You all have
      worked hard on this case for years.  And I didn't
      appreciate seeing this document.  And when I seen it,
      because it wasn't present as part of what I had
      intended and what I meant by getting the co-
      representatives, I didn't then, I didn't now, want to
      make this Court know that you all was ineffective, or
      whatever this document means.

*Id.* at 23-24. Mr. Perry corroborated the testimony of Mr. Donnellon

that counsel maintained routine contact through letters and personal

visits to CCI, provided copies of filings and responded to all of Mr.

29

Perry's questions. *Id*. at 10-12, 14-15, 19-20.

Considering all this evidence, the Court concludes that class counsel is qualified, has competently represented and will continue to vigorously represent the interests of the Class. The Court finds that Mr. Perry, the class representative, does not agree with the suggestion made in the "Memorandum in Support" that counsel's representation of the Class has been in any respect inadequate. Moreover, Mr. Perry's testimony establishes that class counsel maintained meaningful communication and that the in-person meetings at CCI to discuss aspects of this litigation were detailed and never rushed. For example, as discussed *supra*, Mr. Donnellon met with Mr. Perry for more than two hours in order to explain each page of the *Private Settlement Agreement*, which Mr. Perry believes is fair, adequate and reasonable. *Transcript*, pp. 19-20, 49.

Finally, the Court notes that another inmate and former class representative, Jack Frederick, also filed an objection alleging, *inter alia*, that class counsel has colluded with the defendants and has failed to vigorously represent the interests of the Class. Doc. No. 188, p. 1 (citing to Doc. No. 116-1) and Exhibit (a letter dated July 2, 2010 signed by Mr. Donnellon) attached thereto. However, Mr. Frederick lacks standing to object because he is no longer incarcerated at CCI and is therefore not a member of the Class. *Id*. at 2-3 (providing an address at Pickaway Correctional Institution in Orient, Ohio). Moreover, Mr. Frederick's objection was filed on February 28, 2012, *i.e.,* more than seven weeks after the January 9, 2012 deadline for filing objections, and is therefore untimely. *See*, *e.g.*, *In re: Veritas Software Corp. Sec. Litigation*, No.08-3627, 396

30

Fed. Appx. 815 (3rd Cir. Oct. 4, 2010) (finding no abuse of discretion in district court's conclusion that an objection was untimely when it was filed more than four weeks after the deadline provided in the notice to the class). As discussed *supra*, the *Notice* was distributed and posted in compliance with the direction of the Court and provided approximately 30 days for members to file objections. Nowhere in his objection does Mr. Frederick complain that the *Notice* was inadequate or that he had insufficient time in which to file an objection. The Court therefore has no obligation to consider Mr. Frederick's untimely objection. *Cf. Gen'l Motors Corp*, 497 F.3d at 636.

In any event, nothing in Mr. Frederick's objection establishes that class counsel's representation is inadequate. Mr. Frederick generally alleges that class counsel is "indeed in collusion with the Defendants to cheat the Plaintiffs out of their damage awards[.]" Doc. No. 188, p. 1. However, the *Private Settlement Agreement* preserves each class member's claim for monetary relief, which means that any class member may file a lawsuit to recover compensatory or other damages. *See Private Settlement Agreement*, ¶ 6(C). In addition, contrary to Mr. Frederick's assertions, the letter dated July 2, 2010 signed by Mr. Donnellon, Exhibit attached to Doc. No. 188, does not establish that class counsel "coerced" Mr. Frederick into signing an affidavit dated July 7, 2010, Doc. No. 116-1.[10] Counsel's letter simply explained to Mr. Frederick that it is impossible for class counsel to satisfy all the demands of individual

---

[10]This affidavit was offered in support of plaintiffs' memorandum in opposition to objections complaining of the Court's order granting leave to withdraw the original motion to certify and claim for damages, Doc. No. 23. Doc. No. 116 (citing *Order*, Doc. No. 76).

inmates.  The letter also recognized the real possibility that the
class allegations could be dismissed should it be determined that
either class counsel or the class representative is inadequate. Doc.
No. 116-1.  Mr. Frederick offers no evidence that class counsel
coerced him into signing an affidavit or that counsel otherwise failed
to vigorously represent the interests of the Class. Under these
circumstances, the Court is therefore satisfied that the adequacy
requirement, as well as the other requirements under Rule 23(a), have
been met.

**B.    Factors Under Fed. R. Civ. P. 23(b)**

In addition to the requirements of Rule 23(a), a party seeking
certification must show that the class action is maintainable under
one of the three subsections of Rule 23(b).  *Pilgrim*, 660 F.3d at 945.
Here, the parties contend that this action is properly maintained
under Rule 23(b)(2), which provides that "the party opposing the class
has acted or refused to act on grounds that apply generally to the
class, so that final injunctive relief or corresponding declaratory
relief is appropriate respecting the class as a whole[.]"

This Court concludes that certification under Rule 23(b)(2) is
appropriate because plaintiffs' claims are based on conduct (or
inaction) by defendants that is generally applicable to the Class.
Specifically, the presence of asbestos at CCI, and defendants'
response thereto, are generally applicable to the entire proposed
Class, who are incarcerated at that facility.  Injunctive relief,
*i.e.*, the proper maintenance and/or removal of the asbestos at CCI in
accordance with applicable laws and safeguards, is therefore
appropriate with respect to the Class as a whole.  Moreover, courts in

32

this district have previously certified class actions under Rule
23(b)(2) arising from alleged prison conditions that affect the inmate
population as a whole. *See*, *e.g.*, *In re Southern Ohio Correctional
Facility*, 173 F.R.D. 205 (S.D. Ohio 1997) (certifying class under Rule
23(b)(2) based on claims arising from defendants' actions or inaction
during a riot at a maximum security prison in Lucasville, Ohio and
arising from prison conditions following that riot). *Cf*. *Hiatt v.
County of Adams*, 155 F.R.D. 605 (S.D. Ohio 1994) (challenging
conditions of confinement for pretrial detainees).

For all the foregoing reasons, the Court concludes that
certification of the action as a class action under Fed. R. Civ. P.
23(b)(2) is appropriate.   The Court therefore **CERTIFIES** a class of
plaintiffs consisting of "[a]ll inmates in areas identified as
containing unabated asbestos at CCI." *Private Settlement Agreement*, ¶
3.

**III. FINAL APPROVAL OF THE *PRIVATE SETTLEMENT AGREEMENT***

Rule 23(e) governs settlements of class actions and imposes
procedural safeguards that must be followed: the parties must file a
statement identifying the proposed settlement agreement, Fed. R. Civ.
P. 23(e)(3), and the trial court "must direct notice in a reasonable
manner to all class members who would be bound by the" proposed
settlement, Fed. R. Civ. P. 23(e)(1).  In addition, the trial court
may approve a proposed settlement "only after a hearing and on finding
that [the proposed settlement] is fair, reasonable, and adequate."
Fed. R. Civ. P. 23(e)(2).

Here, as detailed above, the parties submitted the terms of

settlement, which the Court has preliminarily approved.  *Joint Motion for Preliminary Approval*; *Order of Preliminary Approval*.  Notice provided to the Class was effected in conformity with the directions of the Court.  *Order of Preliminary Approval*, ¶¶ 5-6; *Notice*, attached thereto; *Unsworn Declaration of Mark Hooks*, submitted as *Defendant's Exhibit A*, attached to *Minute Entry*, Doc. No. 191, p. 71 ("*Hooks Declaration*").  More specifically, Mark Hooks, a Warden's Assistant at CCI, posted copies of the *Notice to Class Members of the Proposed Settlement* in (1) all housing units; (2) all law libraries; and (3) other prominent common locations where all inmates would have access to read it.  *Hooks Declaration*, ¶ 2.  Mr. Hooks also provided that notice directly to each inmate whose access to common areas was limited due to, but not limited to, confinement in segregation or in the infirmary.  *Id*.  In addition, copies of the following documents were placed in the CCI library: (1) *Order of Preliminary Approval*; (2) *Notice to Class Members of Proposed Settlement*; (3) *Private Settlement Agreement*; and (4) *Defendants' Notice of Supplement to the Private Settlement Agreement (Doc. 170-1)*, Doc. No. 173 ("*Notice of Supplement*") (supplementing the *Private Settlement Agreement* with the signature of ODRC Director Gary Mohr).  *Id*. at ¶ 3.  According to Mr. Hooks, the *Notice* was posted and copies were available in the library by December 10, 2011.  *Hooks Declaration*, ¶ 4.

The initial hearing was held on March 13, 2012 and the reopened hearing was held on April 2, 2012. The Court must now determine if the *Private Settlement Agreement* is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  In making this determination, the Court

considers several factors:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen'l Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)) (internal quotation marks omitted). In considering these factors, the task of the court "is not to decide whether one side is right or even whether one side has the better of these arguments. . . . The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *Gen'l Motors Corp*, 497 F.3d at 632.

**A.   The Terms of the *Private Settlement Agreement***

Under the terms of the *Private Settlement Agreement*, asbestos at CCI will be abated in accordance with a prioritized plan developed by the parties with the assistance of Chryatech, Incorporated ("Chryatech"), a firm that provides, *inter alia*, asbestos consulting services. *Id*. at ¶ 5; *Chryatech Qualification Statement* and *Executive Summary*, attached as Exhibit 1-A to the *Private Settlement Agreement* ("Chryatech Report"), p. 628.[11] "All Chryatech, Inc. technical personnel are trained as required by Federal (EPA and OSHA) and State regulations.  They are also licensed/certified by applicable State asbestos regulations." *Id*. at 626 (stating further that "a successful project is one that completely satisfies . . . all applicable

---

[11]The Court will refer to the docket page number in the upper right-hand corner when discussing this document.

environmental, building and safety regulations"); 650 ("All Chryatech, Inc. personnel are licensed through the Ohio Department of Health.").

From December 6, 2010 through January 26, 2011, and acting at the request of state officials, Chryatech visited CCI in order to conduct an asbestos reassessment survey. *Id*. at 648. On May 9, 2011, Chryatech inspected the tunnels and spaces below CCI's buildings in order to assess suspected asbestos in these areas. *Id*. In all, Chryatech surveyed 41 buildings at CCI. *Id*. at 650.

Chryatech reported that the Environmental Protection Agency ("EPA") had developed a method for ranking materials containing asbestos, which has become the industry's "state-of-the-art-method[.]" *Id*. "The rankings of hazard range from 7 - the most hazardous [-] to 1 - the least hazardous. The highest rank is reserved for ACBM [friable asbestos-containing building material] that is 'significantly damaged.'" *Id*. A hazard with "significant damage" "is so extensively damaged or deteriorated that it requires immediate corrective action." *Id*. This type of hazard exists in circumstances such as where "[f]riable asbestos-containing building material[12] (ACBM) is in an area regularly used by building occupants, including maintenance personnel, in the course of their normal activities[.]" *Id*.

Chryatech also reported that, with few exceptions, CCI's main tunnels and areas below the buildings had been abated and no suspect materials/debris was observed. *Id*. at 649. Applying the EPA ranking method to the remaining areas, Chryatech created spreadsheets "listing

---

[12]"Friable asbestos material" is "any material containing more than 1% asbestos that, when dry, can be crumbled, pulverized, or reduced to a powder by hand pressure." Abestos Operations & Maintenance Program (the "O&M Program"), attached as Exhibit 1-B to Doc. No. 170.

the hazard rank, location, type, quantity, and estimated abatement cost for removal by a State certified contract for all of the ACM [asbestos containing materials] we observed." *Id*. at 650. *See also* Chryatech spreadsheets, attached as Exhibit 1-C to Doc. No. 170 ("Chryatech Spreadsheets"). For example, Chryatech identified Dorms D-1, D-2 & D-3 as having friable asbestos-containing materials. Chryatech Spreadsheets, p. 2. Chryatech specifically advised that its spreadsheets "should be used to address potential hazards that may exist [at CCI]." Chryatech Report, p. 650.

As a way of addressing remaining potential asbestos hazards at CCI, Chryatech created the Asbestos Operations and Maintenance Program ("O&M Program"), attached as Exhibit 1-B to the *Private Settlement Agreement*, which strives to "protect inmates at CCI from exposure to potentially hazardous asbestos conditions, ensure compliance with all applicable environmental laws and regulations relating to asbestos, and establish asbestos operation and management procedures for CCI." O&M Program, p. 1. In elaborating on the objectives of the O&M Program, Chryatech detailed CCI's responsibilities during the abatement work and the disposal of asbestos-containing waste in accordance with standards articulated by the Occupational Safety and Health Administration ("OSHA"). *Id*. at 4-16. For example, the O&M Program requires that individuals performing such work receive training specific to the class[13] of asbestos at issue. *Id*.

_____

[13]OSHA recognizes different classes of asbestos work. *Id*. at 2-3. "Class I asbestos work" includes "activities involving the removal of thermal systems insulation and surfacing material." *Id*. at 2.

"Class II asbestos work" includes "activities involving the removal of ACM [asbestos containing material] which is not thermal systems insulation or surfacing material including, but not limited to, the removal of asbestos-

Here, the parties "agree that asbestos at CCI should be addressed in a manner that minimizes inmates to the exposure to friable asbestos." *Private Settlement Agreement*, ¶ 5(B). Under the terms of the *Private Settlement Agreement*, CCI agrees to maintain asbestos according to industry standards and, if abatement work is required in areas containing asbestos, the O&M Program will be utilized. *Id*.

Utilizing the Chryatech Report and Chryatech Spreadsheets, the *Private Settlement Agreement* ranks, in descending order of priority, the areas at CCI that contain asbestos-related material. *Id*. Under the *Private Settlement Agreement*, funding has already been made available to complete abatement in high priority areas, including (1) Dorms D-1, D-2 and D-3 (priority 1); (2) F-1 Dorm (priority 2); and (3) all remaining areas of the hospital building (priority 3). *Id*. The parties chose to address these locations because, according to Chryatech, these areas have the greatest amount of asbestos with the highest risk ranking based upon location, accessibility and condition of material. *Id*. The *Private Settlement Agreement* also contemplates that CCI will initiate the abatement process for these three priority areas within thirty days after the Court approves the parties' agreement. *Id*.[14]

---

containing wallboard, floor tile and sheeting, roofing and siding shingles, and construction mastics." *Id*.

"Class III asbestos work" includes "repair and maintenance operations where ACM, including thermal systems insulation and surfacing material, is likely to be disturbed." *Id*. at 3.

"Class IV asbestos work" includes maintenance and custodial activities during which employees/workers contact but do not disturb ACM/PACM [presumed asbestos-containing materials] and activities to clean up dust, waste, and debris resulting from Class I, II, and III asbestos work." *Id*.

[14]Mr. Cholar testified at the initial hearing that abatement had already been completed in the specified D and F dorms and that abatement in the hospital building was expected to be completed by April 1, 2012.

As for additional locations that contain asbestos-related material beyond the three priority areas identified above, CCI will address those other locations in accordance with the O&M Program until additional funding from the General Assembly becomes available.  *Id.* "CCI will request funding for abatement of the remaining asbestos containing material at CCI at least yearly until all asbestos at CCI" identified in the *Private Settlement Agreement* has been remediated. *Id.*

The *Private Settlement Agreement* is enforceable in state court. *Id.* at ¶ 6(B). Thus, individual CCI inmates may file in state court an action arising out of the performance or non-performance of CCI's obligations under the *Private Settlement Agreement*.  *Id.*[15]

The *Private Settlement Agreement* tolls the statute of limitations (until this case is dismissed) for individual claims for personal injuries or other types of money damages relating to alleged exposure of asbestos in violation of the Eighth Amendment.  *Id.* at ¶ 6(C). Stated differently, the *Private Settlement Agreement* preserves the right of individual inmates to assert their own claims, in either state or federal court, for personal injury arising from alleged asbestos exposure in violation of the Eighth Amendment.  *Id.*

With some exceptions, including individual claims for personal injury discussed above, the members of the Class agree to release all

_____

[15]Under the Prison Litigation Reform Act, 18 U.S.C. § 3626, prospective relief in a consent decree must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." § 3626(a)(1).  However, private settlement agreements need not comply with those limitations and "any party claiming that a private settlement agreement has been breached" may seek "in State court any remedy available under State law." § 3626(c)(2)(B).

defendants of and from any and all claims, whether known or unknown, whether accrued or to accrue, relating to the removal or abatement of asbestos at CCI.  *Id*. at ¶ 6(D).

Under the terms of the *Private Settlement Agreement*, the State of Ohio, on defendants' behalf, will pay to plaintiffs' class counsel attorneys' fees and expenses in the amount of $70,000.  *Id*. at ¶ 7(D).

The *Private Settlement Agreement* contemplates that, upon Court approval, the parties will submit a stipulation of dismissal with prejudice.  *Id*. at ¶ 6(A) (citing Exhibit 1-D, attached thereto).  The Court will not retain jurisdiction over implementation of the *Private Settlement Agreement*.  *Id*.[16]

**B.    There Is No Risk of Fraud or Collusion**

Having carefully examined the terms of the *Private Settlement Agreement*, the Court now turns to the first factor of its inquiry, *i.e.,* the risk of fraud or collusion, in determining whether or not the *Private Settlement Agreement* is fair, reasonable and adequate. *See Poplar Creek Dev*. *Co*., 636 F.3d at 244.  Unless there is evidence to the contrary, "[c]ourts presume the absence of fraud or collusion in class action settlements[.]"  *Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 839 (E.D. Mich. 2008).  At the initial hearing, class counsel represented and Mr. Cholar testified that settlement discussions were extensive and at times heated.  The procedural history of this litigation, detailed above, supports this representation and testimony.  The parties reached an agreement only

---

[16]Indeed, under the Prison Litigation Reform Act, the Court may not retain jurisdiction over enforcement of the terms of the *Private Settlement Agreement* "other than the reinstatement of the civil proceeding that the agreement settled." *See* 18 U.S.C. § 3626(c)(2).

after more than three years of litigation, which included two years of settlement discussions.  Throughout much of that time, the parties consulted or relied heavily on an independent expert, Chryatech, for guidance. *See*, *e.g.*, *Order*, Doc. No. 69; *Order*, Doc. No. 123; *Order*, Doc. No. 129; *Order*, Doc. No. 134; *Order*, Doc. No. 142; *Order*, Doc. No. 143; *Order*, Doc. No. 149.[17]  Chryatech's involvement therefore underscores a finding that the *Private Settlement Agreement* was the product of arms-length negotiations, rather than the result of fraud or collusion.

The objections filed by two CCI inmates characterizing the *Private Settlement Agreement* as the product of collusion does not require a different conclusion.  Doc. No. 175, pp. 8-10; Doc. No. 189 (offering the letter dated July 2, 2010 signed by Mr. Donnellon as a supplement to Doc. No. 175).[18]  Inmates William L. Ridenour and Tommy Lee Brown argue that evidence of collusion can be seen in the fact that the *Private Settlement Agreement* "affords only non-pecuniary relief to class members[.]"  Doc. No. 175, p. 8.  This objection misses the mark.  To attempt to address the individual claims for compensatory damages on behalf of several thousand inmates would be nearly impossible.  Indeed, whether or not such an action would qualify as an appropriate class action is debatable.  However, the

---

[17]Counsel for both sides confirmed at the initial hearing that the periodic conferences with the undersigned reflected on the docket were status conferences and involved no substantive settlement discussions with the undersigned.  Stated differently, these conferences simply required counsel to provide periodic updates on the status of the litigation.

[18]A third inmate and former class representative, Jack Frederick, also filed an objection based, in part, on collusion as evidenced by the failure of the *Private Settlement Agreement* to authorize the payment of monetary damages. Doc. No. 188, p. 1.  However, for the reasons discussed *supra* and *infra*, Mr. Frederick's objection is without merit.

*Private Settlement Agreement* tolls the statute of limitations (until this case is dismissed) for individual claims for personal injuries or other types of money damages relating to alleged exposure of asbestos in violation of the Eighth Amendment. *Private Settlement Agreement*, ¶ 6(C). Therefore, although the *Private Settlement Agreement* does not offer monetary damages to the Class, the *Private Settlement Agreement* has preserved to all inmates at CCI the right seek monetary damages in connection with claimed personal injury arising from alleged asbestos exposure in violation of the Eighth Amendment. *Id*. The suggestion that the *Private Settlement Agreement* is collusive or fraudulent because it fails to provide monetary damages to a Class of approximately 2600 inmates, Doc. Nos. 175 and 189, is simply without merit. Accordingly, the Court finds no evidence of collusion or fraud, and this factor weighs in favor of finding the *Private Settlement Agreement* to be fair, reasonable and adequate.

**C.    Continued Litigation Would Be Complex, Expensive and Lengthy**

In considering the next factor, it is indisputable that this action raises complex constitutional factual and legal issues and involves complicated scientific and medical evidence. Absent settlement, resolution of the litigation is likely to require many years more, would be extremely expensive and may entail an appeal from any judgment entered by this Court. This factor therefore weighs in favor of approving the *Private Settlement Agreement*.

**D.    The Parties Have Engaged In Extensive Discovery**

The parties have completed a significant amount of discovery over

42

the past four years, producing more than 10,000 documents and taking 17 or 18 depositions.  All of this information afforded the parties the opportunity to assess the strengths and weaknesses of each side. This factor therefore weighs in favor of finding the *Private Settlement Agreement* fair, adequate and reasonable.

### E.    Plaintiffs' Likelihood of Success on the Merits Is Not Overwhelming

"'The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits.  The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured.'"  *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d at 245 (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d at 1086)(internal quotation marks omitted).  In order to prevail on an Eighth Amendment claim such as that presented in this case, plaintiffs must establish that defendants were deliberately indifferent to the health or safety of the inmates.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  In this regard, plaintiffs must bear "the onerous burden of proving [an] official's subjective knowledge" when establishing deliberate indifference.  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). *See also Jones v. Muskegon County*, 625 F.3d 935, 947 (6th Cir. 2010) (stating that deliberate indifference "is a very high standard of culpability, exceeding gross negligence") (quoting *Ross v. Duggan*, 402 F.3d 575, 590 n.7 (6th Cir. 2004) (internal quotation marks omitted). Failure to meet this high standard would foreclose all possibility of relief for the Class.  Experienced counsel on both sides of the case acknowledge that establishing liability and causation in this action

43

would be difficult.[19]  The uncertainty surrounding plaintiffs' ability
to establish their claims weighs in favor of approving the *Private
Settlement Agreement*.

> **F.  Experienced Counsel and the Class Representative Support
> Approval of the *Private Settlement Agreement***

Experienced counsel on both sides of this case recommend that the
Court approve the *Private Settlement Agreement* and this recommendation
is entitled to deference.  *See, e.g., Williams v. Vukovich*, 720 F.2d
909, 922-23 (6th Cir. 1983) ("The court should defer to the judgment
of experienced counsel who has competently evaluated the strength of
his proofs[,]" and that deference "should correspond to the amount of
discovery completed and the character of the evidence uncovered").
Here, class counsel have a combined professional experience of
approximately 40 years.  *See, e.g.*, Doc. No. 191, pp. 5-10 (detailing
the experience of class counsel).  Class counsel ask the Court to
approve the *Private Settlement Agreement*, which they believe is in the
best interests of the Class because it will improve prison conditions
and bring immediate relief.  Former lead counsel for defendants, Mr.
Cholar, has practiced law for 20 years and has extensive experience in
Section 1983 litigation as well as class actions.  Mr. Cholar also
agrees with class counsel that the *Private Settlement Agreement* is
fair, adequate and reasonable.

In addition, and as recounted at length *supra*, class
representative Alfonsia Perry testified that he wants the Court to
approve the *Private Settlement Agreement* because he believes that it

---

[19]Class counsel represented that, even after conducting a nationwide
search, they are unaware of any other prisoner class action asbestos case that
survived summary judgment; the cases were either settled or dismissed.

44

is fair.  Accordingly, the judgment of experienced counsel and the opinion of the class representative support the approval of the *Private Settlement Agreement*.

### G. The Objections to the *Private Settlement Agreement* Lack Merit

In determining whether a class action settlement is fair, adequate and reasonable, a court must also consider the reaction of absent class members.  *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001).  "The fact that some class members object to the Settlement [Agreement] does not by itself prevent the court from approving the agreement."  *Id*.  Moreover, "if only a small number of objections to a class action settlement are received, that fact can be viewed as indicative of the adequacy of the settlement."  *In re Delphi Corp. Sec.*, 248 F.R.D. 483, 500 (E.D. Mich. 2008).  *See also Hainey v. Parrott*, 617 F. Supp. 2d 668, 675 (S.D. Ohio 2007) ("Generally, however, a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable and adequate.").

Here, out of approximately 2600 class members, only 16 objections were filed, for a total objection rate of .6%.  *See* Doc. Nos. 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 188, 189, 193, 194, 202.  The actual objection rate is even lower when one considers that some inmates filed more than one objection[20] and that at least one objector lacks standing to object because he is no longer incarcerated

---

[20]*See* Doc. Nos. 175 (filed by William Ridenour and Tommy Lee Brown), 183 (filed by Michael Roberts),  189 (filed by Messrs. Ridenour and Brown), 193 (filed by, *inter alios*, Mr. Roberts), 194 (filed by Mr. Roberts).

45

at CCI.[21]   Finally, Alfonsia Perry, the class representative,
repudiated his objection.  *See* Doc. Nos. 185 (filed by Mr. Perry, who
later renounced this objection under oath), 186 (purporting to
withdraw Doc. No. 185).  Therefore, this miniscule percentage of
objections relative to the size of the Class weighs in favor of
finding the *Private Settlement Agreement* to be fair, reasonable and
adequate.  *See In re Delphi Corp. Sec.*, 248 F.R.D. at 500; *Hainey*, 617
F. Supp. 2d at 675.

Moreover, even after considering the merits of all the
objections, the Court finds no reason to conclude that the *Private
Settlement Agreement* is unfair, inadequate or otherwise unreasonable.

### 1. *Private Settlement Agreement* Allows Defendants to Deny Constitutional Culpability

Some inmates object to the *Private Settlement Agreement* because
it allows defendants to deny constitutional culpability.  *See* Doc.
Nos. 180, 181, 182, 183, 193.  As an initial matter, the Court notes
that permitting a party to deny legal culpability is a fairly common
term in settlement agreements; the fact that defendants do not concede
liability on plaintiffs' claims does not render the *Private Settlement
Agreement* unfair or unreasonable.  The Court concludes that the
*Private Settlement Agreement* carefully balances the rights of
individual Class members to file their own actions for monetary
damages and the interest of the Class in obtaining immediate relief.
This objection provides no basis for rejecting the *Private Settlement
Agreement*.

---

[21]*See* Doc. No. 188 (filed by Jack Frederick from the Pickaway
Correctional Institution).

46

2.    **Relief Under the *Private Settlement Agreement* Is Contingent on Funding by the General Assembly**

At least one objection complains that, because defendants' obligations under the *Private Settlement Agreement* are in certain respects contingent on funding by the Ohio General Assembly, the Class will have no recourse should the Ohio General Assembly fail to fund the remediation. *See* Doc. No. 175. However, as the *Private Settlement Agreement* makes clear, *Private Settlement Agreement*, ¶ 5(B), funding is already available to remediate the areas most affected by asbestos. Mr. Cholar testified that defendants have already obtained funding to deal with approximately 90% of the asbestos-related material. Mr. Cholar also explained that the State cannot, under Ohio law, enter into an agreement that requires the expenditure of public funds that have not yet been allocated. In this regard, the *Private Settlement Agreement* imposes a continuing yearly obligation to request more funding until all obligations under the *Private Settlement Agreement* have been met. *Id.* Finally, and as noted *supra*, the Class may seek enforcement of any failure on the part of defendants to fulfill their obligations under the *Private Settlement Agreement*. In short, this feature of the *Private Settlement Agreement* does not render it unfair, inadequate or unreasonable.

3.    **Remediation Occurs While Inmates Still Live in CCI and Violates OSHA**

Other inmates object to the *Private Settlement Agreement* because inmates must continue living in CCI during the remediation process, allegedly in violation of OSHA standards. *See* Doc. Nos. 176, 177,

47

178, 179, 180, 181, 182, 183, 194, 202.  These objections also note, *inter alia*, that inmates are to be rotated in and out of dorms D-1, D-2 and D-3 in violation of OSHA and that "sociopathic" inmates have access to friable asbestos during the remediation process.

These objections are without merit.  The suggestion that "sociopathic" inmates have access to asbestos is unsupported by any evidence whatsoever. Chryatech, whose employees are certified in asbestos remdiation and abatement, has detailed CCI's responsibilities during the abatement work and the disposal of asbestos-containing waste in accordance with OSHA standards.  Stated differently, defendants are to follow a plan developed by Chryatech that complies with state and federal law.  For example, Mr. Cholar testified that air quality safety testing is required during the remediation process and that prison officials utilize the services of a third party in obtaining air samples. Moreover, defendants utilize a "glovebag" method for containing asbestos, a process that complies with state and federal regulations and which does not require that inmates be removed during the remediation process.

To the extent that inmate Michael Roberts offers his sworn contention that CCI remediation violates OSHA and/or other state and federal laws, Doc. No. 194, the Court is not persuaded that Mr. Roberts is an expert in asbestos remediation.  As detailed *supra*, the Chryatech Report is comprehensive and was developed by experts certified in the field.  In short, there is no evidence that the *Private Settlement Agreement*, in addressing the containment and removal of asbestos-related material, violates OSHA or any other law.

**4.  Closure of CCI Is the Only Proper Remedy**

Some objecting inmates demand that CCI be closed.  Doc. Nos. 175, 185.[22]  However, Mr. Cholar, who has years of experience in prison litigation, testified that closing CCI – either temporarily or permanently – would be almost impossible:  there are simply not enough beds at other Ohio prisons to accommodate the approximately 2600 inmates who would be displaced were CCI to be closed. Based on this evidence, the Court is not persuaded that a fair, adequate and reasonable settlement requires the closure of CCI.

### 5.    The *Private Settlement Agreement* Does Not Provide Monetary Damages

Most of the objections relate to the failure of the *Private Settlement Agreement* to provide any monetary damages to inmates.  *See* Doc. Nos. 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 188, 193. However, as discussed *supra*, the *Private Settlement Agreement* preserves each class member's right to pursue a claim for monetary relief.  *See Private Settlement Agreement*, ¶ 6(C).  Moreover, the highly individualized analyses necessary to such claims call into question the propriety of the class action as a vehicle for resolving such claims. These objections do not weigh against the approval of the *Private Settlement Agreement*.

### 6.    Defendants Cannot Be Trusted To Comply with the Terms of the *Private Settlement Agreement*

Finally, some inmates are concerned that defendants cannot be

---

[22]Although Mr. Perry later repudiated the objections contained within this document, documents attached to the objection indicate that other inmates, Bill Moralevitz, Charles Soward and Claude Spencer, object to the *Private Settlement Agreement* for the reasons contained therein.  Doc. Nos. 185-1, 185-2.

trusted to abide by the terms of the *Private Settlement Agreement*. *See* Doc. Nos. 185, 188.  These concerns do not militate against approval.  First, defendants have already nearly completed much of the remediation required by the *Private Settlement Agreement*.  Second, should defendants fail to fulfill their obligations, the *Private Settlement Agreement* is, as noted *supra*, enforceable in state court. *Private Settlement Agreement*, ¶ 6(B). These objections are without merit.

In sum, none of the objections provide a basis for rejecting the *Private Settlement Agreement*.

**H.    The *Private Settlement Agreement* Supports the Public Interest**

"There is a strong public interest in encouraging settlement of complex litigation and class-action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources."  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (citing *Granada Investments, Inc. v. DWG Corp.*, 962 F2d 1203, 1205 (6th Cir. 1992)).  Here, the Court agrees with counsel for both sides that removing asbestos from CCI improves prison conditions for inmates and staff, which in turn furthers society's broader interests.  Settlement of this case also conserves judicial resources by bringing this litigation to a close. In sum, the Court is persuaded that creating a safer environment at CCI serves the public interest, which weighs in favor of approving the *Private Settlement Agreement*.

**I.    Attorneys' Fees and Expenses**

The *Private Settlement Agreement* authorizes the payment to class

counsel attorneys' fees and expenses in the amount of $70,000.00.
*Private Settlement Agreement*, ¶ 7(D). Pursuant to 42 U.S.C. § 1988, a
"court, in its discretion, may allow the prevailing party, other than
the United States, a reasonable attorney's fee as part of the
costs[.]" 42 U.S.C. § 1988(b). One method for determining a
"reasonable" fee is the lodestar analysis, which requires the
calculation of "'the number of hours reasonably expended on the
litigation multiplied by a reasonable hourly rate.'" *Wayne v. Village
of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994) (quoting *Hensley v.
Eckerhart*, 461 U.S. 424, 433 (1983)). *See also Rawlings v.
Prudential-Bache Prop., Inc.*, 9 F.3d 513, 517 (6th Cir. 1993) (noting
that the district court "recognized that it had a choice between the
two methods [of calculating attorney's fees, the lodestar analysis and
the percentage of fund method]"). The United States Supreme Court has
recognized several benefits of a lodestar analysis. *See Perdue v.
Kenny*, __ U.S. ___, 130 S.Ct. 1662, 1672 (2010). For example, using
"prevailing market rates in the relevant community[,]" this method
awards approximately what the prevailing attorney would have earned
from a client paying hourly attorney wages in a comparable case. *Id.*
(citations and internal quotation marks omitted). In addition, the
lodestar approach is "readily administratable." *Id.* (citations and
internal quotation marks omitted). Finally, the lodestar method
provides an "objective" calculation, which "produces reasonably
predictable results." *Id.* (citations and internal quotation marks
omitted). Indeed, the lodestar analysis has "achieved dominance in
the federal courts" and has "become the guiding light of our fee-
shifting jurisprudence." *Id.* (quoting *Gisbrecht v. Barnhart*, 535 U.S.

51

789, 801 (1984)) (internal quotation marks omitted).  Accordingly, the Court concludes that the lodestar analysis is an appropriate method for determining a reasonable attorneys' fee in this case.

The parties have agreed that an award of $70,000.00 will compensate class counsel for not only all fees and expenses already incurred but also all fees and costs that may be incurred in the future.  *Private Settlement Agreement*, ¶ 7(D).  Class counsel have submitted detailed information regarding their normal hourly rates, and that of a paralegal, and have specified the hours expended by them on this matter.  *Plaintiff's Bench Memorandum Regarding Attorney Fees and Expenses*, attached to *Minute Entry*, Doc. No. 191, pp. 2-70.  The amount authorized in the *Private Settlement Agreement*, *i.e.*, $70,000, is well below the amount suggested by the lodestar calculation.  *See*, *e.g.*, Doc. No. 191, p. 18.[23]  The Court is satisfied that the $70,000 award of attorney's fees in this case is reasonable, *i.e.*, "one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers."  *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (quoting *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)).


**IV.  MOTIONS TO INTERVENE**

Several inmates filed motions "to be added to the on going law suit," which were docketed as motions for leave to intervene.  Doc.

---

[23]The lodestar analysis would suggest an award of attorneys' fees of approximately $175,000.

Nos. 155, 157, 158,[24] 161, 162, 168, 169.[25]  The Honorable John D.
Holschuh, the former trial judge in the case, ordered that motions for
leave to intervene be stayed pending resolution of the joint motion to
certify a settlement class.  *Order*, Doc. No. 76.  The named parties
take the position that, should this Court certify the Class and
approve the *Private Settlement Agreement*, these motions would be
rendered moot because any movants still incarcerated at CCI would be
included as members of the Class.

It is not at all clear to the Court that movants actually seek
leave to intervene in the action as named parties.  Rather, all the
motions appear to express interest in, and support for, the class
action.  It is notable, in the Court's view, that none of the movants
filed objections to the *Private Settlement Agreement*.  In any event,
none of the movants demonstrates that he "is so situated that
disposing of the action may as a practical matter impair or impede the
movant's ability to protect [his] interest," Fed. R. Civ. P. 24(a)(2),
or that "the existing parties [do not] adequately represent that
interest."  *Id*.  Intervention of right is therefore unwarranted.
Moreover, although each of the movants articulated "a claim . . . that
shares with the main action a common question of law or fact," *see*
Fed. R. Civ. P. 24(b)(1)(B), to permit intervention at this stage of
the proceedings would "unduly delay or prejudice the adjudication of
the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Permissive

---

[24]Shawn Harris, the inmate who filed Doc. No. 158, is no longer
incarcerated at CCI.  *Notice of Change of Address,* Doc. No. 195.

[25]David Cobb, who may also have expressed an interest in joining the
action, *see* Doc. No. 150, is no longer incarcerated at CCI.  *Notice of Change
of Address*, Doc. No. 187.

intervention is therefore also unwarranted.

The motions for leave to intervene, Doc. Nos. 155, 157, 158, 161, 162, 168, 169, are therefore **DENIED.**

## V. REQUESTS TO WITHDRAW DOC. NOS. 185, 192, 193

Mr. Perry, the class representative, has moved to withdraw his previously filed objection, Doc. No. 185, *See* Doc. No. 186, and class counsel moved, at the reopened hearing, for leave to withdraw the *Motion for Multiple Class Representatives*, Doc. No. 192, and *Motion Regarding Adequacy of Class Counsel*, Doc. No. 193, in light of Mr. Perry's sworn disavowal of the content of those motions. Because the Court has now reviewed the substance of Mr. Perry's objection and motions, the Court **DENIES** the requests to withdraw that objection and those motions.

**WHEREUPON**, plaintiff Alfonsia Perry's notice of withdrawal, Doc. No. 186, of his objection, Doc. No. 185, and class counsel's oral request to withdraw Doc. Nos. 192 and 193, are **DENIED.** All objections to the *Private Settlement Agreement*, Doc. Nos. 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 188, 189, 193, 194, 202, are **OVERRULED.** The motion to add multiple class representatives, Doc. No. 192, as well as the motion signifying lack of fair and adequate representation, Doc. No. 193, are **DENIED.** The maintenance of the action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is **APPROVED.** The Court **CERTIFIES** a class of plaintiffs consisting of all inmates in areas identified as containing unabated asbestos at CCI. The parties' request that the Court give final approval to the *Private Settlement Agreement*, attached as Exhibit 1 to the *Joint Motion for*

54

*Preliminary Approval of Proposed Class Action Settlement*, Doc. No.
170, is **GRANTED**.  The Court hereby **APPROVES** the *Private Settlement*
*Agreement.*  The motions for leave to intervene, Doc. Nos. 155, 157,
158, 161, 162, 168, 169, are **DENIED.**


April 26, 2012                    *s/Norah McCann King*
                            Norah M^cCann King
                       United States Magistrate Judge

55